IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

**STATE OF TENNESSEE V. MICHAEL BRIAN GOODWIN**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S40,623     R. Jerry Beck, Judge**

**No. E1999-02424-CCA-R3-CD - Decided**
**May 8, 2000**

The defendant, Michael Brian Goodwin, appeals from his convictions for two counts of attempted first degree murder, for which he received concurrent twenty-year sentences. The defendant contends that the evidence is insufficient, that the trial court should have suppressed statements he made to the police, that the state's failure to produce exculpatory evidence violated his right to due process, that the trial court erred in sentencing, and that the cumulative effect of the errors deprived him of a fair trial. We affirm the judgments of conviction and hold that the evidence is sufficient, that the defendant's statements were properly admitted because the defendant waived his Miranda rights, that the defendant failed to show that the evidence not produced by the state was material, that the trial court's imposition of the presumptive midrange sentence was proper, and that the defendant was not denied a fair trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIPTON, J. delivered the opinion of the court, in which WADE, P.J., and WITT, J., joined.

E. Lynn Dougherty and Thomas Seeley, Jr., Bristol, Tennessee; Stephen M. Wallace, District Public Defender; Joseph S. Harrison, Assistant Public Defender, Blountville, Tennessee (at trial); and Gerald L. Gulley, Jr., Knoxville, Tennessee (on appeal) for the appellant, Michael Brian Goodwin.

Paul G. Summers, Attorney General & Reporter; Clinton J. Morgan, Counsel for the State; H. Greeley Wells, Jr., District Attorney General; and Gregory A. Newman and Mary Katharine Harvey, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Michael Brian Goodwin, appeals as of right from his convictions by a jury in the Sullivan County Criminal Court for two counts of attempted first degree murder, a Class A felony. The defendant was sentenced as a Range I, standard offender to twenty years for each count, to be served concurrently. He contends that:

1. the evidence is insufficient to support the convictions;

2. the trial court erred by denying his motion to suppress statements he made to the police in violation of his rights to counsel and against self-incrimination;

3. his due process rights were violated when the state failed to produce exculpatory evidence;

4. the trial court imposed an excessive sentence; and

5. the cumulative effect of the errors deprived him of due process.

We affirm the judgments of conviction.

The defendant's convictions are the result of his shooting the two victims, William Thomas "Billy Bob" Byington and Chad Baker, as they were driving. Mr. Byington testified that on August 16, 1997, he and Mr. Baker left work at 6:30 p.m. and stopped at the Bristol Motor Speedway. He and Mr. Baker visited with friends and each drank about five beers over a four hour period. They went to Mr. Baker's house later that night and watched television.

Mr. Byington testified that around 1:00 a.m., he decided to call Karen Turner, whom he had briefly dated earlier in the year. He said that he had seen Ms. Turner a few weeks earlier and that she had given him her number and had told him to call her. Mr. Byington testified that he spoke with Ms. Turner but that the call was disconnected. He said that the defendant answered when he called back and that they exchanged heated words. He said that the defendant "said something about kicking my ass," and that he told the defendant to "come and do it," agreeing to meet at a Conoco gas station. Mr. Byington said that as he and Mr. Baker were about to leave, the defendant called and asked if he was coming. Mr. Byington said that he told the defendant he was and that when the defendant asked what car he would be driving, he responded that he would be in Mr. Baker's truck.

Mr. Byington testified that he rode with Mr. Baker to Conoco. Mr. Baker slowed down as they approached the gas station, but no one was there. Mr. Baker turned around and drove by Conoco again, but no one was there, and they decided to go home. As they were driving on Highway 11E approaching the exit to Highway 37, Mr. Byington heard gunshots as a truck pulled beside their vehicle. Mr. Baker stated that he had been shot and stopped the vehicle. The defendant's truck veered in front of them, and the defendant shot into the cab, hitting the windshield. Mr. Byington was struck twice in the left shoulder and in the wrist, and Mr. Baker was struck in the shoulder. Mr. Byington said that he had glass in his eyes and mouth from the shattered windshield and became confused and disoriented. He said he thought that Mr. Baker, who had fainted over the steering wheel, was dead. Mr. Byington was in the hospital for two days and had bullets removed from his shoulder and wrist. One bullet is too dangerous to remove and remains in his shoulder. Mr. Byington testified that he did not bring any weapons to Conoco, that he does not own a gun, and that he did not expect the fight with the defendant to involve firearms. He admitted that his blood alcohol content level was .15 percent at 3:10 a.m.

Chad Baker testified that he went to the restroom when Mr. Byington called Karen Turner. When Mr. Byington called Ms. Turner a second time, he heard Mr. Byington "say something about kicking somebody's ass." After Mr. Byington hung up, the telephone rang and Mr. Byington spoke to the defendant. Mr. Byington then told Mr. Baker that he and the defendant were meeting at Conoco to fight. Mr. Baker said that Mr. Byington never said anything about weapons being

involved. Chad Baker's testimony regarding the shootings was substantially similar to that of Mr. Byington.

Kimberly Rutledge testified that she is Karen Turner's sister and that Ms. Turner called her in the early morning before the shooting. She said that Ms. Turner told her that Billy Bob and Chad had been calling all night and harassing her and that she and the defendant were going to meet them at Conoco. She said that Ms. Turner needed her to watch Ms. Turner's children while they were gone. Ms. Rutledge testified that when Ms. Turner and the defendant came back about fifteen minutes later, Ms. Turner was upset and went upstairs to call their mother. She said that the defendant parked his truck in the garage, which was unusual, and that she thought the defendant was trying to hide the truck. She said that the defendant seemed confused and told her that he thought he had "shot up" a truck twelve times. She said that she told the defendant that if he did shoot the truck, the police would find bullet shells. She said the defendant told her that he had taken care of that.

Lorraine Duty, Karen Turner's mother, testified that she called Ms. Turner after the shooting. She said that the defendant answered and that she asked the defendant if he knew who had been shot. She said the defendant responded that he did not. She said that when she told the defendant that Mr. Byington and Mr. Baker had been shot, the defendant said "good or something," and asked if it killed them. She admitted that she gave a statement to the police in which she said the defendant told her, "too bad it or I didn't kill them." She admitted telling the police that the defendant never denied shooting the victims and showed no remorse.

Detective Jerry Smeltzer of the Bristol Police Department testified that he responded to a report of shots fired on Highway 11E near the Bristol Motor Speedway. He saw the victims' truck in the emergency lane at the top of an exit ramp to Highway 37, and the passenger door was open. He inspected the truck and canvassed the area looking for shell casings but found none. He did not find any weapons in the victims' vehicle. Later that morning, he called the defendant and explained that he was investigating a shooting and was looking for the vehicle involved. The defendant was cooperative and agreed to come to the police station, arriving at about 7:00 a.m. Detective Smeltzer told the defendant that he had a description of the vehicle involved in the shooting that matched Ms. Turner's truck. The defendant denied any involvement in the shooting. Detective Smeltzer said that when he asked the defendant if he would submit to a gunshot residue test, the defendant became hostile and stated that he had recently fired a gun and had not yet bathed.

Detective Smeltzer testified that on August 18, he asked the defendant to return to the police station for more questioning. He said that earlier that day, he had retrieved an answering machine tape from Ms. Duty. The tape was of a conversation between Ms. Turner and Ms. Duty immediately after the shootings. Detective Smeltzer said he played part of the tape for the defendant and told the defendant that Ms. Turner had already admitted her involvement in the incident. Detective Smeltzer testified that the defendant's demeanor immediately changed and that the defendant became talkative and stated that he did not want the police to involve Ms. Turner. The defendant made a statement which was admitted into evidence. In the statement, the defendant said that Mr. Byington called Ms. Turner at around 1:00 a.m. He said that when Mr. Byington called a second time, he answered the

telephone, and he and Mr. Byington argued about Ms. Turner. He told Mr. Byington he would "receive a kicked ass," threats were exchanged, and they agreed to meet at Conoco. After he hung up, he had Ms. Turner check the caller identification box for the number. He then called Mr. Byington, and more threats were exchanged. The defendant told Ms. Turner that he was going to Conoco to "go down there and kick [Byington's] ass." Mr. Byington called back and asked if he was coming, and he told him that he was. The defendant said that he "heard some mention of shells," and that he took his shotgun and a .9 millimeter handgun with him. Ms. Turner asked her sister to watch her children and then rode with him to Conoco.

The defendant stated that he drove past Conoco twice but saw no one there. He parked across the street in a used car lot and waited. When the victims drove by, he drove his truck out of the lot and told Ms. Turner to lay back her seat. He said he used the handgun to fire out the passenger window of his truck into the victims' truck. He said he was not sure how many times he hit the truck but that he fired a total of twelve shots. He drove across the ramp to Highway 37 and fired at the front of the victims' truck. He then drove home and parked his vehicle at the bottom of a hill. He told Ms. Rutledge that he shot at the victims and hit the truck but did not know if he struck them. At about 3:00 a.m., he took the barrel out of the handgun and replaced it with the barrel from another gun. He had already thrown the shell casings from his truck into his backyard. He stated that he had not planned to shoot into the victims' vehicle until he told Ms. Turner to lie down. He denied aiming the gun at the victims.

Detective Smeltzer testified that he typed the defendant's statement, read it aloud to him, and allowed him to read it. He said the defendant checked the statement for errors and signed it. Detective Smeltzer testified that he could not produce the audiotaped conversation between Ms. Turner and her mother because the audio was lost when the power went out on the digital recorder.

The defendant testified that on August 15, 1997, he and Ms. Turner went to bed shortly after midnight. The defendant's testimony regarding the events of the morning was similar to his statement to the police. At trial, however, he testified that the victims threatened to come to Ms. Turner's house if he did not meet them at Conoco. He said that Mr. Byington told him that he "had enough shells to take care of me and anybody else that came with me." He said that when he drove beside the victims' truck on Highway 11E, he saw the passenger make a move over the seat and saw someone's arm rise up with something in their hand. He said that he thought the passenger had a gun and that he began to shoot. The defendant admitted that the facts stated in his trial testimony were not included in his written statement to Detective Smeltzer. He testified that he gave the information to the detective but that the detective told him it was irrelevant.

The state called Detective Smeltzer in rebuttal. He testified that the defendant never said that Mr. Byington threatened to come to Ms. Turner's house, never said that Mr. Byington stated that he had enough shells to take care of the defendant and anybody else, and never mentioned anyone in the victims' truck raising their arm or having anything in their hand. He iterated that the defendant read the statement and was allowed to review it for changes or corrections. Upon the foregoing evidence, the jury convicted the defendant of two counts of attempted first degree murder.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions. He argues that the proof does not establish that he shot the victims intentionally and with premeditation. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Pursuant to Tenn. Code Ann. § 39-12-101(a)(2), a person commits a criminal attempt when he or she "with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" First degree murder is defined as the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-302(a)(1). A premeditated act is one "done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Furthermore, the element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

The evidence at trial showed that the defendant agreed to meet Mr. Byington for a fight. Although the defendant testified that he heard the mention of shells, Mr. Byington and Mr. Baker testified that they did not believe the fight would involve weapons and that they did not have any weapons with them. The defendant, however, took a .9 millimeter handgun and a shotgun to the meeting. When the defendant arrived and did not see the victims, he pulled into a parking lot and waited. When he saw them, he drove next to them and immediately began shooting. He then drove in front of their vehicle and continued his shooting spree, aiming through the victims' windshield into the cab of their truck and firing a total of twelve shots. Officers who responded to the scene reported finding no weapons in the victims' truck. We hold that the evidence sufficiently supports the defendant's convictions for attempted first degree murder.

# II. MOTION TO SUPPRESS

The defendant contends that the trial court erred by denying his motion to suppress statements he made to the police orally on August 16 and the statement that was reduced to writing

on August 18. He argues that he was under constructive arrest such that warnings were required pursuant to Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). The state contends that the defendant was not in custody and that, in any event, the defendant was provided with Miranda warnings and signed a waiver of his rights.

At the hearing on the motion to suppress, Detective Smeltzer testified that he called the defendant at 6:30 a.m. on August 16 and advised him of the shooting. He told the defendant that he was not under arrest but that he needed to talk to him. He said that the defendant was cooperative and agreed to come to the police station. He said he told the defendant that he could send a cruiser to get him or that he could drive himself. He said the defendant chose to have a cruiser take him to the station. Detective Smeltzer testified that when the defendant arrived at 7:00 a.m., he showed the defendant a written Miranda rights form and read it aloud to the defendant. The defendant signed a rights waiver form, which was admitted into evidence. He said the defendant spoke with him freely and never asked for an attorney. He said he told the defendant that a vehicle matching Ms. Turner's was reported as being involved in the shooting. He said that the defendant told him the victims were calling and acting silly but that he never left his home and had gone to bed. The defendant became hostile when Detective Smeltzer asked for a gunshot residue test, and the defendant told Detective Smeltzer to arrest him or let him go. Detective Smeltzer said he told the defendant that he was free to leave at any time. He said the defendant explained that he had test-fired a gun he was going to purchase the night before and had not bathed since. He said the defendant then admitted lying and purchasing an illegal sawed-off barrel shotgun. At the end of the interview, an officer took the defendant home.

Detective Smeltzer testified that he interviewed Ms. Turner at the station on August 18 and that he then went to Ms. Turner's residence to find the defendant. He said that he asked the defendant to come to the station to answer more questions and that the defendant was angry with him for talking to Ms. Turner. He said that the defendant did not want to go but that Lieutenant Smith said that he could get a warrant. He said the defendant agreed to answer their questions and drove himself to the station at about 4:15 p.m.

Detective Smeltzer testified that he read the defendant his Miranda rights and let the defendant read the form. The defendant signed a rights waiver form, which was admitted into evidence. Detective Smeltzer said that the defendant never requested an attorney. He told the defendant that he had found a tape recording, which he played for the defendant, and that he had taken a statement from Ms. Turner. He said that the defendant's mood changed and that he became very cooperative. The defendant gave an oral statement, Detective Smeltzer reduced it to writing, and the defendant signed it.

Detective Smeltzer testified that the recording he played for the defendant was of a 2:00 a.m. conversation between Ms. Turner and Ms. Duty and was from Ms. Duty's digital answering machine. He said that during the recording, Ms. Turner yelled for Ms. Duty to pick up the telephone and stated that she wanted Ms. Duty to listen to a police scanner to see if the police knew the defendant had just shot Mr. Byington. According to Detective Smeltzer, Ms. Duty then picked up

the telephone, and Ms. Turner explained that she and the defendant had gone to meet the victims and that the defendant had shot at them while they were in their vehicle. Detective Smeltzer testified that officers took Ms. Duty's digital answering machine with the tape inside and placed it in the evidence room. He said he did not realize that because the machine was digital, any loss of power would result in loss of messages. He explained that when the battery in the machine expired, the recording was lost.

Bill Smith, a retired detective from the Bristol Police Department, testified that he was a supervisor on August 16 and that he was present when the defendant was interviewed. He said he was not present when the defendant signed his rights waiver form. He testified, however, that on August 18, he witnessed the defendant sign the rights waiver form.

The defendant testified that Detective Smeltzer called him on August 16 at 6:30 a.m. and asked if he owned a green Ford pickup truck. He said Detective Smeltzer wanted him to come to the station for questioning and said that an officer could drive him to the station. He said that four police cruisers arrived within five minutes and that he rode with one of them to the station. He said that he was placed in an interview room which he believed to be locked, although he admitted that he was able to open the door when he had to leave the room. He said that Detective Smeltzer tore off a piece of paper from a note pad and told him to sign the paper before any questions were asked. The defendant said that he signed the paper without reading it and that the detective did not read it aloud. He said that at the end of the interview, he told Detective Smeltzer that he probably needed an attorney but that he got no response.

The defendant testified that on August 18, Detective Smeltzer and two other detectives came to his house and said that they needed him at the station for more questions. He said the detectives told him that they had been questioning Ms. Turner. He said that one of the men told him that if he did not come to the station, they could get a warrant and arrest him. The defendant said he drove himself to the station. He said that he signed the same form he signed before and that he did not read it. He said that when Detective Smeltzer played part of a tape, he told the detective he definitely needed an attorney. He said that Detective Smeltzer told him that Ms. Turner was going to be charged and that it would help him in court if he cooperated and gave a statement. He said that he was told he was under arrest and that he gave a statement.

The trial court denied the motion to suppress. After making extensive findings of fact, the trial court stated that it "would accredit the testimony of both officers that testified in regards to the signing of the waiver, the advice of rights form . . . . And the Court finds that the - that the two statements were voluntarily entered into by the Defendant."

Initially, we note that a trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The defendant contends that the oral statements he made on the 16th and the statement reduced to writing on the 18th should have been suppressed because he was under "constructive arrest," and Miranda warnings were required. Pursuant to Miranda, custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S. Ct. at 1612. The Tennessee Supreme Court has held that:

> the appropriate inquiry in determining whether an individual is "in custody" and entitled to Miranda warnings is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with formal arrest. The test is objective from the viewpoint of the suspect . . . .

State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). Some of the factors to be considered include the time and location of the interrogation, its duration, the officer's tone of voice and general demeanor, the method in which the suspect was transported to the place of questioning, and any limitation on the movement or other form of restraint imposed on the suspect. Id.

Considering the foregoing factors, we do not believe that the defendant was in custody. The record shows that the officers informed the defendant that he was not under arrest and was free to leave at any time. Though the defendant claimed that he was in a locked room, he admitted that he was able to open the door and leave to go to the restroom. On the 16th, the defendant was given the choice to have an officer take him to the station or to drive himself, and the defendant chose to ride with an officer. On the 18th, the defendant drove himself to the station. Nothing in the record suggests that the defendant was significantly deprived of his freedom. Regardless, the defendant was administered Miranda warnings, and our review of the record supports the trial court's finding that the defendant voluntarily waived his Miranda rights. Detective Smeltzer testified that on both days, the defendant read his rights and that they were read aloud to him. The defendant signed a written rights waiver form which was admitted into evidence. Detective Smith testified that he witnessed the defendant sign the rights waiver form on the 18th. Detective Smeltzer testified that the defendant never requested an attorney. The trial court accredited the officers' testimony, and the record does not preponderate against its findings.

### III. BRADY VIOLATION

The defendant contends that his due process rights were violated by the state's withholding exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). He argues that the state violated his due process rights by failing to produce the audiotaped conversation between Ms. Turner and Ms. Duty. At the hearing on the motion to suppress the tape, Detective Smeltzer testified that the evidence had become lost due to a power failure that had erased the message. However, the state located the tape several weeks after trial.[1] At the motion for new trial hearing, the defendant's attorneys conceded that the state acted in good faith and submitted the tape when they found it.

---

[1] The record is unclear whether the state located the original or a copy.

The defendant argues that statements made by Ms. Turner on the tape would have been admissible at trial as excited utterances and were arguably relevant to determining who was the initial aggressor. At the motion for new trial hearing, the trial court determined that although Ms. Turner's statements would have been admissible as excited utterances and were relevant, "the withheld evidence, which appears to be in good faith, . . . would not command the Court to grant a new trial on his issue under the materiality standard . . . ." The court found that most of the content of the conversation was redundant in that it was developed at trial through other testimony.

In Brady, the United States Supreme Court determined that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 393 U.S. at 87, 83 S. Ct. at 1196-97; see also Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). Before a defendant is entitled to relief under Brady, he must establish that (1) the prosecution suppressed the evidence, (2) the evidence suppressed was favorable to the defendant, and (3) the evidence was material. 373 U.S. at 87, 83 S. Ct. at 1196-97. Evidence is considered material under this standard only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1556 (1995) (citation omitted); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). The burden of proving a Brady violation rests with the defendant, and the violation must be proved by a preponderance of the evidence. Edgin, 902 S.W.2d at 389; State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993).

The defendant does not articulate which statements on the audiotape would be "arguably relevant" to the issue of who was the initial aggressor. Most of the tape involves a rehashing of the evening's events that were included in the testimony at trial, and portions of the beginning of the tape are difficult to understand. However, the defendant's brief states that the relevant conversation "relates to the question of who arranged the meeting of the combatants for the fight . . . ." We agree with the trial court that any such statements would not be material under Brady. Regardless of who arranged the fight, the evidence shows that it was the defendant who brought guns and who shot the unarmed victims. Thus, the defendant has failed to show a reasonable probability that had the evidence been produced, a different result would have been reached.

## IV. SENTENCING

The defendant contends that the trial court imposed an excessive sentence. He argues that the court erred by applying enhancement factor (5), that the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense, and by failing to consider the defendant's employment history in mitigation. See Tenn. Code Ann. §§ 40-35-114(5), -113(13). The state argues that the enhancement factor is applicable because the defendant left the victims to die after shooting them. It argues that the trial court properly denied the mitigating factor because the defendant's employment history is poor and does not warrant a sentence reduction.

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

<u>State v. Jones</u>, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a <u>de novo</u> review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; <u>see</u> <u>Ashby</u>, 823 S.W.2d at 168; <u>State v. Moss</u>, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; <u>Moss</u>, 727 S.W.2d at 237; <u>see</u> <u>Ashby</u>, 823 S.W.2d at 169.

A presentence report was introduced into evidence at the sentencing hearing. It reflects that the then twenty-five-year-old defendant quit high school in the tenth grade but later earned his G.E.D. The defendant reported excellent physical and mental health and stated that he used alcohol occasionally and has not used marijuana since he was seventeen. The report reflects that the defendant was fired from his position as an electrician's helper at Bristol Motor Speedway in 1997. It reflects that at the time of trial, he was employed at C&S Electrical as a journeyman. The

defendant's employer reported that he was an excellent employee. The defendant submitted a statement for the report in which he expressed remorse for the shootings.

The trial court found the following enhancement factors applicable, as listed in Tenn. Code Ann. § 40-35-114:

> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; [and]
> (9) The defendant possessed or employed a firearm[.]

In mitigation, the trial court considered that the defendant acted under strong provocation, that he has no prior criminal record, and that he has a wife and two small children to support. Tenn. Code Ann. §§ 40-35-113(2), (13). The trial court gave little weight to the mitigating factors. The trial court determined that the enhancement and mitigating factors "balance[d] each other out" and ordered the presumptive midrange sentence of twenty years.

The defendant contends that the trial court erred by enhancing his sentence based upon the exceptional cruelty factor. The state contends that the enhancement factor applies because the defendant left the victims alone to die. The application of factor (5) requires "exceptional cruelty," which is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). Our supreme court has held that the facts must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)); see State v. Ervin Lee Haynes, No. 01C01-9808-CR-00374, Davidson County, slip op. at 12 (Tenn. Crim. App. July 9, 1999) (noting that a "rational argument can be made that a person who simply enters a victim's home, shoots the victim with the intent to kill the victim, and then leaves the home does not necessarily have a greater culpability through exceptional cruelty if the victim survives, although left alone."). In addition, we note that the factor requires that the cruelty occur "during the commission of the offense." Tenn. Code Ann. § 40-35-114(5). Under these circumstances, we believe that the trial court erred by applying this enhancement factor. The defendant's actions in driving away immediately after the shooting do not indicate a culpability distinct from and appreciably greater than that necessary to accomplish the crime.

The defendant also contends that the trial court erred by failing to consider his work history in mitigation. The record is conflicting regarding the nature of the defendant's work history. The record shows that he was fired from one job but that his employer at the time of trial described him as an excellent employee. In this respect, we believe that even if the trial court had considered the defendant's employment history in mitigation, it would be entitled to little weight. See generally State v. McKnight, 900 S.W.2d 36, 35 (Tenn. Crim. App. 1994) (indicating that family contributions and work ethic might be a mitigating factor); but see State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994) (concluding that a stable work history is expected of every citizen and should not be applied in mitigation).

Having held that the trial court erred by applying one enhancement factor, we nevertheless believe that a sentence reduction is not warranted. The defendant's use of a firearm, when balanced with the mitigating factors, justifies the presumptive sentence.

## V.  CUMULATIVE EFFECT OF ERRORS

The defendant contends that the cumulative effect of errors deprived him of a fair trial. Having found no substantial errors that would alter the outcome of the case, we view the issue to be without merit.

In consideration of the foregoing and the record as a whole, we affirm the judgments of conviction.